IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 5, 2020

## STATE OF TENNESSEE v. STACY ANN GIVENS

**Appeal from the Circuit Court for Henderson County**
**No. 19-104-1 Roy B. Morgan, Jr., Judge**

_____

## No. W2019-01799-CCA-R3-CD

_____

Defendant-Appellant, Stacy Ann Givens, was indicted by a Henderson County grand jury of filing a false police report in violation of Tennessee Code Annotated section 39-16-502, a Class D felony, and misuse of 911 in violation of Tennessee Code Annotated section 7-86-316, a Class C felony. Following a jury trial, the Defendant was convicted of both offenses. The trial court sentenced the Defendant as a Range II, multiple offender to five years' imprisonment for the filing a false police report conviction and thirty days' imprisonment for the misuse of 911 conviction, to be served concurrently. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether the evidence is sufficient to support the filing a false police report conviction, and (2) whether the trial court abused its discretion by denying the Defendant an alternative sentence. Upon review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

George Morton Googe, District Public Defender, and Hayley F. Johnson, Assistant Public Defender, for the Defendant-Appellant, Stacy Ann Givens.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Angela R. Scott, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

John Wayne Chatham and Stacy Ann Givens, the Defendant, lived together in a trailer at 270 Chatham Lane. Chatham's mother owned the property the trailer was on and lived in a separate residence on the property. The Defendant had lived with Chatham since

August of 2017 and Chatham described their relationship as "on and off." On January 13, 2019, Chatham's friend, Pamela Rikard, came to visit him at his home. At 9:28 that evening, the Defendant called 911 and gave the false name "Michelle Buckwhite." She alleged that her boyfriend and a woman named Pam were doing drugs at the residence, both she and the owner of the property had asked Pam to leave, and Pam refused to leave. The Defendant told the officer who arrived to the scene that she called 911 because she and Chatham had been in a physical altercation. The Defendant was subsequently indicted by a Henderson County grand jury of filing a false police report and misuse of 911. See Tenn. Code Ann. §§ 39-16-502, 7-86-316. The following proof was adduced at trial.

Pamela Rikard had been friends with Chatham for forty-five years. Rikard testified that she visited Chatham frequently.[1] Chatham confirmed he and Rikard had an intimate relationship "a long time ago." Rikard testified that she "knows of" the Defendant and saw her at Chatham's residence when she visited on previous occasions. Rikard visited Chatham at his home on the evening of January 13, 2019. The following events occurred that night.

At 8:21 that evening, Rikard called police to report vandalism to her vehicle. Rikard testified that the Defendant had taken "a big piece of wood" and shattered the back window of her car. Rikard admitted she does not remember seeing the Defendant break the window but said she "heard it" and heard the Defendant say, "this is just the beginning."

Zachary Lomax, a deputy for the Henderson County Sheriff's Office, responded to the vandalism report at 270 Chatham Lane. When he arrived, only Rikard and Chatham were present. Deputy Lomax observed the vehicle and spoke with Rikard and Chatham, who identified the Defendant as the perpetrator. Chatham told Deputy Lomax that the Defendant had his car and described the vehicle. Deputy Lomax proceeded to patrol the area in search of the Defendant but was unable to locate her.

At 9:28 that evening, Henderson County 911 received a call from an individual who identified herself as "Michelle Buckwhite." The caller stated she lived at 270 Chatham Lane with her boyfriend. She alleged that her boyfriend and a woman named "Pam" were doing drugs at the residence, that she asked Pam to leave, and that Pam refused to leave the premises. The caller stated that the owner of the property had also asked Pam to leave.

Deputy Lomax was dispatched back to 270 Chatham Lane to respond to this call. When he arrived, only Chatham was present. Deputy Lomax began searching for the

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

Defendant a second time and located Chatham's unoccupied vehicle half a mile from the residence. Continuing his search, Deputy Lomax found the Defendant across the highway from where the vehicle was found, coming out of the woods. He described the Defendant as "cut up from head to toe" with her hair "completely soaking wet." He stated that the cuts looked "like she had been running through a field of briars. The Defendant admitted that she made the 911 call and gave the false name Michelle Buckwhite." The Defendant told Deputy Lomax "she'd been running in the woods from Johnny" and called 911 because "her and Johnny had been in a physical altercation earlier in the night and she called Pam on an assault." She also stated that she wanted Rikard to leave the home. Deputy Lomax did not investigate the Defendant's claim that a physical altercation had occurred.

At trial, the Defendant confirmed that she gave 911 a false name. She testified about why she called 911:

> Because I was telling her that I wanted her to leave and she wouldn't leave, and I was trying to get her to leave and I thought that they would come and help me to get them to leave – get her to leave, so I called 911. But then I got scared. When they asked me my name I got scared because me and Johnny had been fussing and I didn't want nobody – I didn't want any trouble. I didn't want us in trouble from arguing and fighting and stuff.

The Defendant admitted that Chatham told Rikard she could stay.

On cross-examination, the Defendant contended she did not lie when she told 911 that the owner of the property had asked Rikard to leave, because Chatham's mother had also told Rikard to leave the property. When questioned further, the Defendant admitted she did not know whether Chatham's mother had asked Rikard to leave, stating "I don't know . . . I wasn't there." When asked to clarify why she called 911, the Defendant stated that she and Chatham were arguing and that she was scared "he was gonna get a'hold of me." However, the Defendant later stated she called to get assistance in removing Rikard from the property.

The Defendant testified she was found coming out of the woods because Chatham "was angry and was coming at me . . . ." She claimed the argument between her and Chatham began because she "had his truck earlier." The Defendant claimed she did not mention the domestic dispute during the 911 call because she "figured they'd take care of it when they got there." The Defendant admitted to drinking that evening.

Chatham testified that he never asked Rikard to leave his home. He denied using drugs that night but stated he had been drinking. He admitted he argued with the Defendant earlier that day but maintained that no physical altercation occurred and that he "didn't

- 3 -

touch her." Chatham testified that he never saw the Defendant that night. However, on cross-examination, he claimed that while he never heard the Defendant ask Rikard to leave, it was "possible" she did, indicating that the Defendant was present at some point.

Rikard testified she was never asked to leave the property. She stated she was not using drugs but did not indicate whether she had been drinking. Rikard said she did not witness a physical altercation between Chatham and the Defendant. She testified that she never saw or spoke with the Defendant that night. However, on cross-examination, Rikard said she saw the Defendant pull into the driveway as she was standing on Chatham's porch and she told the Defendant "the law had already been called." She did not specify when this interaction occurred.

After deliberation, the jury convicted the Defendant of filing a false police report and misuse of 911. The Defendant's sentencing hearing was held on September 13, 2019. The Defendant's daughter, Cassandra Patterson, testified at the hearing. Patterson stated that the Defendant lives with and cares for her father, Patterson's grandfather. Patterson testified that the Defendant's father has significant health problems and that no other family members are available to care for him. The trial court noted that the Defendant had tested positive for methamphetamine since the trial when she was taken into custody for unrelated charges. Patterson stated that she knew her mother had a past drug problem but did not think she had one currently.

The trial court considered one enhancement factor, the Defendant's previous history of criminal convictions and criminal behavior, when determining her sentence. Tenn. Code Ann. § 40-35-114(1) (2020). The trial court determined the Defendant was not a candidate for alternative sentencing based on the following factors: "the Defendant's presentence report, criminal history, the nature of the offense, the lack of truthfulness of the Defendant in this matter, the fact that the Defendant has . . . been given the opportunity for probation in the past and has failed to be successful." The trial court sentenced the Defendant as a Range II, multiple offender to five years' imprisonment for filing a false police report and thirty days imprisonment for misuse of 911, to be served concurrently. The Defendant filed a timely notice of appeal, and her case is now properly before this court for review.

## ANALYSIS

The Defendant argues that the State failed to prove beyond a reasonable doubt that she knowingly or intentionally made a false statement to a law enforcement officer. In response, the State contends that the evidence presented at trial was sufficient to prove every element of the offense. We agree with the State.

- 4 -

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Tennessee Code Annotated section 39-16-502(a)(1) sets forth the definition of filing a false police report:

(a) It is unlawful for any person to:

(1) Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:

(A) The offense or incident reported did not occur;

(B) The person has no information relating to the offense or incident reported; or

(C) The information relating to the offense reported is false. . .

Tenn. Code Ann. § 39-16-502(a)(1) (2010).

A statement is defined as "any representation of fact." Id. § 39-16-501 (1989). The Defendant contends that she "in good faith was reporting a true offense" because she "believed Rikard was trespassing in her home and that she had the right to have her removed." However, the evidence presented at trial was sufficient for the jury to conclude that the incident the Defendant reported did not occur or that she gave law enforcement false information pertaining to the incident. Id. § 39-16-502(a)(1)(A), (C) (2010).

First, the Defendant admitted to giving the 911 operator the false name "Michelle Buckwhite." Further, the record shows the Defendant told the 911 operator that Chatham and Rikard were doing drugs in the home. Chatham and Rikard testified that this accusation was false. Additionally, the Defendant told 911 that the owner of the property asked Rikard to leave. At trial, the Defendant admitted she "wasn't there" and did not know whether Chatham's mother, the owner of the property, had asked Rikard to leave. The Defendant also claimed that she personally asked Rikard to leave the property and maintained this assertion at trial. However, Rikard testified that the Defendant never asked her to leave. When there is a discrepancy between two witnesses' testimonies, "the weight and credibility of [the] testimony of a witness, and the reconciliation of conflicts in testimony, are matters entrusted exclusively to the jury as the triers of fact." Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The jury was entitled to conclude that Rikard's testimony was more reliable than the Defendant's. "A guilty verdict from the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in the evidence in favor of the state." State v. Sylvester Smith, No. W2012-00259-CCA-R3-CD, 2012 WL 5938017 (Tenn. Crim. App. Nov. 4, 2013) (citing State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Hatchett, 560 S.W.2d 627, 629 (Tenn.1978)). Accordingly, based on the above evidence, a reasonable jury could have found beyond a reasonable doubt that the Defendant knowingly or intentionally made a false police report.

Next, the Defendant argues that the trial court erred in denying alternative sentencing. The Defendant contends that the trial court should have granted probation or split confinement because of her need for drug rehabilitation treatment and her role as the sole caretaker of her ill father. The State argues that the trial court properly exercised its discretion when denying alternative sentencing. We agree with the State.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(5) (2006) gives courts guidance regarding the types of defendant who should be required to serve their sentences in confinement:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

Tenn. Code Ann. § 40-35-102(5) (2006).

In addition, Tennessee Code Annotated section 40-35-102(6)(A) (2006) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Id. § 40-35-102(6)(D) (2006).

A trial court should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C) (2006); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. See id. (citing Tenn. Code Ann. § 40-35-303(b)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. See Tenn. Code Ann. § 40-35-303(a) (2006). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b) (2006). In addition, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b) (2006), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would "'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978)). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4) (2006). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" Id. § 40-35-103(5). Moreover, our supreme court has held that truthfulness is a factor which the court may consider in deciding whether to grant or deny probation. Bunch, 646 S.W.2d at 160 (citing State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981)).

In this case, the trial court made the required findings on the record when denying the Defendant an alternative sentence. The trial court reviewed the presentence report and the evidence presented at trial and determined that the Defendant was not a good candidate for an alternative sentence. The Defendant had eighteen prior convictions, including several probation violations. The trial court concluded that the Defendant had an extensive

criminal history and that less restrictive means had been applied frequently in the past without success. Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of confinement, we affirm the trial court's denial of an alternative sentence.

## **CONCLUSION**

Based on the analysis above, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE